# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HARRY T. COLLINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action |
| | ) No. 05-624-SLR |
| WARDEN RAPHAEL WILLIAMS and | ) |
| CORRECTIONAL MEDICAL SYSTEMS, | ) |
| | ) |
| Defendants. | ) |

Deposition of HARRY T. COLLINS, taken pursuant to notice at the offices of the Delaware Department of Justice, 820 N. French Street, 6th Floor, Wilmington, Delaware, beginning at 10:01 a.m., on Monday, November 19, 2007, before Debra A. Donnelly, Registered Professional Reporter and Notary Public.

APPEARANCES:

    ERIKA Y. TROSS, ESQUIRE
    DELAWARE DEPARTMENT OF JUSTICE
        820 N. French Street, 6th Floor
        Wilmington, Delaware  19801
        for Warden Raphael Williams

    JAMES E. DRNEC, ESQUIRE
    BALICK & BALICK, LLC
        711 King Street
        Wilmington, Delaware  19801
        for Correctional Medical Systems

- - - - - - - - - - - - - - - - - - - - - - - - - -

CORBETT & WILCOX
REGISTERED PROFESSIONAL REPORTERS
230 N. MARKET STREET   WILMINGTON, DELAWARE   19801
(302) 571-0510
Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

2 (Pages 2 to 5)

## Page 2

1  HARRY T. COLLINS,
2  having been first sworn on oath, was
3  examined and testified as follows:
4  --
5      MS. TROSS: This is a deposition of
6  Harry T. Collins, SBI No. 00156625, in the case Harry
7  Collins vs. Linda Hunter, Warden Raphael Williams and
8  Correctional Medical Systems, Civil Action No. 06-624.
9         EXAMINATION
10 BY MS. TROSS:
11     Q. Mr. Collins, as I stated to you earlier, my
12 name is Erika Tross. I represent Warden Raphael --
13     A. Civil Action No. 05-624-SLR.
14     Q. I'm sorry, that's correct. Thank you for
15 correcting me.
16         Mr. Collins, as I stated to you earlier,
17 my name is Erika Tross. I represent State Defendant
18 Warden Raphael Williams in the matter.
19         And I'm going to let Mr. Drnec introduce
20 himself for the record.
21         MR. DRNEC: James Drnec for Correctional
22 Medical Services, Inc.
23 BY MS. TROSS:
24     Q. I'm going to explain to you a little bit about

## Page 3

1  the deposition process.
2      A. All right.
3      Q. It's part of discovery. It's a series of
4  questions where your answers are being given under oath
5  and are subject to the laws relating to perjury.
6          You can object to any question I ask,
7  but you still must answer the question.
8          The court reporter will be taking down
9  all of my questions and all of your answers, so we can't
10 speak at the same time, because she can only take down
11 what is being said. So we need to speak one at a time.
12 And all your responses must be verbal. You can't nod
13 your head or say uh-huh, you have to say yes or no if the
14 question requires a yes or no answer.
15         I will assume that if you answer a
16 question, you've understood the question. So if you
17 don't understand the question, please let me know, and
18 I'll either try to rephrase it or explain what I'm asking
19 for.
20         You are allowed to take breaks. If you
21 need to take a break to use the restroom --
22     A. How long does this take?
23     Q. It's going to take, I would say, a few hours.
24     A. A few hours?

## Page 4

1      Q. Yes. So if you need to take a break just
2  because you want to stop for a moment or you would like
3  to use the restroom, please let me know, and we will
4  accommodate you.
5          I will give you time at the end to add
6  anything you think we didn't cover.
7          And I need to know if you are taking any
8  medication or drugs which cloud your judgment or prevent
9  you from giving honest answers to my questions?
10     A. No.
11     Q. Okay. Let's talk a bit about your history.
12         Can you state your full name for the
13 record?
14     A. Harry T. Collins.
15     Q. Have you used any other names or aliases?
16     A. Yes.
17     Q. Could you tell me those other names, please?
18     A. Right offhand, I'm not exactly sure.
19     Q. Have you ever gone by the name Clarence
20 Shupe --
21     A. Yes, I have.
22     Q. -- S-H-U-P-E?
23         Just to remind you, we need to speak one
24 at a time for the sake of the court reporter.

## Page 5

1          What about the name Tom Cruz, C-R-U-Z?
2      A. Yes.
3      Q. Thomas Cruse, C-R-U-S-E?
4      A. I'm not sure.
5      Q. You are not sure?
6          Thomas Cosner, C-O-S-N-E-R, have you
7  ever gone by that name?
8      A. Yes.
9      Q. Thomas Swan, S-W-A-N, have you ever --
10     A. I'm not sure.
11     Q. You're not sure about that name?
12         Have you ever gone by any nickname or
13 street name?
14     A. Tom.
15     Q. The T in your name, what does that stand for?
16     A. Thomas.
17     Q. I see you brought some items with you to this
18 deposition.
19         Are those documents that have been
20 produced in this case?
21     A. Yes.
22     Q. Is there anything that you have with you that
23 you haven't produced to the defendants in this case?
24     A. No. Yes.

Page 6

1   Q. What would that be?
2   A. Medical files, before and after.
3   Q. Did you receive a copy of the State
4   defendants' interrogatories and request for production of
5   documents in this case?
6   A. Not sure.
7   Q. Okay. We will talk a little bit about those
8   later.
9       Have you ever been deposed before?
10  A. What's that mean?
11  Q. What we're doing now.
12  A. No.
13  Q. Have you ever gone through this before?
14  A. No.
15  Q. Have you ever testified in court before?
16  A. No.
17  Q. Have you ever filed a civil lawsuit besides
18  this one?
19  A. No.
20  Q. What is your date of birth?
21  A. 10/3/58.
22  Q. Where were you born?
23  A. Wilmington, Delaware.
24  Q. Did you also grow up in Wilmington?

Page 7

1   A. Yes.
2   Q. Prior to your incarceration, your most recent
3   one that began on June 14th, where did you live just
4   prior to that?
5   A. 211 Harding Avenue, H-A-R-D-I-N-G.
6   Wilmington, Delaware, 19804.
7   Q. How long were you a resident at Harding
8   Avenue?
9   A. Fifteen years, off and on.
10  Q. Who did you live with prior to --
11  A. Mother.
12  Q. I just need to finish the question before you
13  answer.
14      Who did you live with prior to that
15  current incarceration?
16  A. Mother.
17  Q. What is your highest level of education?
18  A. Eighth grade. Do you want to know what my IQ
19  is?
20  Q. No, thank you.
21  A. 148. I tested out between 146 and 148.
22  Q. Okay.
23  A. That's two points away from genius, if you
24  really want to know.

Page 8

1   Q. Where did you attend the 8th grade?
2   A. Wilmington High.
3   Q. What was the last full-time job you held prior
4   to your incarceration?
5   A. I owned a Mr. Softee truck.
6   Q. Say that again?
7   A. I owned a Mr. Softee truck. Ice cream
8   business.
9   Q. How long were you in the ice cream business?
10  A. About eight years. I made anywhere between 6
11  to a thousand dollars a day.
12  Q. Are you currently married?
13  A. No.
14  Q. Do you have any children?
15  A. Three.
16  Q. Mr. Collins, who is Raphael Williams?
17  A. That's the warden of the prison.
18  Q. Of which prison?
19  A. Gander Hill.
20  Q. If I use the name Howard Young, will you
21  understand that --
22  A. Yes, I will.
23  Q. -- to mean the same as Gander Hill?
24  A. Yes, I will.

Page 9

1   Q. Can you give me a physical description of
2   Warden Williams?
3   A. I have never seen this man before in my life.
4   Q. Have you ever had a conversation with him?
5   A. I have never had a conversation with this man
6   in my life.
7   Q. Mr. Collins, do you understand the difference
8   between what someone personally does and what their
9   employees do?
10  A. I understand the difference that Mr. Williams
11  is responsible for everything that happens in that
12  prison. And I understand the difference that when
13  everything hits the fan, he is the one supposed to answer
14  any and all questions and debate it and come up with a
15  reasonable decision on what happens in his prison. He's
16  responsible for that. That's what I understand.
17  Q. And your understanding, what is that based on?
18  Have you read that somewhere?
19  A. That's based on his authority.
20  Q. What do you base --
21  A. Just like the president of the United States.
22  Q. What do you base Warden Williams' authority
23  on?
24  A. Like the president of the United States.

4 (Pages 10 to 13)

Page 10

1  Q. But have you read somewhere what you just
2  described?
3  A. Would I have to?
4  Q. I'm asking you: Have you read somewhere what
5  you just described?
6  A. Assumption. That's usually the way it works,
7  isn't it, chain of command?
8  Q. So you are assuming that --
9  A. No, I am not assuming anything. I'm -- I'm
10 going by the education that I grew up with.
11 Q. But you haven't --
12 A. And what I've learned in the law libraries.
13 And Mr. Williams is responsible for whatever happens in
14 his prison.
15 Q. So going back to my original question, do you
16 understand the difference between what someone personally
17 does and what their employees do?
18 A. Yes, I do.
19 Q. What is the difference?
20 A. The difference is -- I don't understand the
21 question.
22 Q. For example, do you understand what the warden
23 does, as opposed to what his correctional officers do, do
24 you understand that there is a difference there?

Page 11

1  A. Well, I understand that when he finds out what
2  they do, he's supposed to make a reasonable assumption
3  and do something about it, act on his authority. That I
4  understand.
5  Q. Do you understand that --
6  A. Which he hasn't done in any of these matters,
7  not to my knowledge. It was never approached to me on
8  any assumption or belief or anything, for that matter,
9  not even -- nobody has even come to me in writing or said
10 anything to me or anything.
11         I understand one of his officers grabbed
12 me by the throat until I passed out. And I understand
13 that, that he -- he damn near strangled me to death, and
14 in order to make up for it, he sent me down the hole for
15 30 days. I understand that. Just so he could cover his
16 own back.
17         And I understand another thing, too. I
18 would like to press charges on this man. The two years
19 is not up yet for an assault, and I would definitely like
20 to press charges on this man. I have been meaning to
21 call you about that for a long time now.
22         I understand that I give them in writing
23 the fact of what he done to me, and there was supposed to
24 be an investigation, their so-called investigation. And

Page 12

1  I understand that nothing was ever found.
2          I understand that the officers that were
3  in that mod when this happened were supposed to act upon
4  theirselves and do something about it, stand up to be
5  accounted for. But considering the fact that they all
6  stick together is a reasonable assumption that nothing
7  would happen about it in the first place.
8  Q. Are you finished?
9  A. Yes.
10 Q. Do you understand that correctional officers
11 must have the ability to take action and make decisions
12 without consulting the warden?
13 A. Not in that extent, no.
14 Q. So it's your belief that correctional officers
15 must always ask the warden permission before doing
16 something?
17 A. No, it's my belief that a correctional officer
18 is always supposed to act in a reasonable manner before
19 taking any type of action given to him, appointed to him.
20 Like, they have certain procedures they have to go
21 through. That's my belief.
22 Q. Do you know what decisions the warden is
23 involved in and what decisions he's not involved in?
24 A. It's my reasonable assumption that he is

Page 13

1  involved in all the decisions.
2  Q. And you said that's your assumption?
3  A. Yes.
4  Q. What is your assumption based on?
5  A. Chain of command.
6  Q. Is it based on anything that you have read?
7  A. Some things I have read in the law library,
8  yes.
9  Q. Such as what?
10 A. I can't exactly comment on that right at this
11 point in time.
12 Q. Why can't you comment?
13 A. Because I have read a lot of things in the law
14 library. I don't know just exactly everything I've read.
15 Q. Are you referring to cases that you've read?
16 Are you referring to Department of Correction policies
17 that you've read?
18 A. I think it was something to do with Department
19 of Correction policies.
20 Q. Do you remember what those policies are?
21 A. Not exactly. I couldn't even point them out
22 to you at this time.
23 Q. Well, if you do remember them, either at any
24 time during this deposition or afterwards, if you could

## Page 14

1  please let me know what policies you are referring to.
2  Thank you.
3      A.  You make this whole thing out to look like the
4  warden is not responsible for anything in what he does.
5      Q.  I don't believe I've ever said that to you
6  just now.
7      A.  It's the questions that you are asking me.
8      Q.  Well, I'm trying to --
9      A.  That's a reasonable assumption to me right
10 there, that you are saying that -- you know, this is like
11 a joke.  You know what?  This is a joke.
12     Q.  Mr. Collins, I'm trying to understand why you
13 sued Warden Williams, why you made him a defendant in
14 this lawsuit?
15     A.  Well, I will tell you what.  Let's get him in
16 court and find out then.
17     Q.  Mr. Collins, let me tell you that if you
18 choose --
19     A.  I'm not sitting here for two hours for this in
20 the first place.
21     Q.  If you choose not to continue with this, the
22 defendants will move to dismiss this case for your
23 failure to prosecute it.
24     A.  Let them move to dismiss it, then.  Because

## Page 15

1  you know what --
2      Q.  So you are choosing to end this deposition?
3      A.  Yep.  Because these questions you are asking
4  me I think are very threatening.
5      Q.  How have I threatened you?
6      A.  Because you are just -- I kind of figured this
7  out anyway.
8      Q.  Well, Mr. Collins, I just want you to
9  understand that the defendants will move to dismiss this
10 case.
11     A.  That's all right.  Then I will appeal to a
12 higher court, Supreme Court, you know.  I have no problem
13 with that.  And I will get my day in court.  Eventually I
14 will get my day in court.
15         MS. TROSS:  Okay.  The deposition of
16 Harry Collins is now over, as Mr. Collins has chosen to
17 leave the deposition before it's ended.
18         Do you have anything you would like to
19 say for the record?
20         MR. DRNEC:  No, I think the record
21 speaks for itself.
22         (Deposition concluded at 10:15 a.m.)
23
24

## Page 16

           I N D E X

DEPONENT:  HARRY T. COLLINS              PAGE

  Examination by Ms. Tross              2

           E X H I B I T S
(There were no exhibits marked for identification.)


CERTIFICATE OF REPORTER                  PAGE 17

## Page 17

           C E R T I F I C A T E
STATE OF DELAWARE

NEW CASTLE COUNTY

    I, Debra A. Donnelly, a Notary Public within and for
the County and State aforesaid, do hereby certify that
the foregoing deposition of HARRY T. COLLINS was taken
before me, pursuant to notice, at the time and place
indicated; that said deponent was by me duly sworn to
tell the truth, the whole truth, and nothing but the
truth; that the testimony of said deponent was correctly
recorded in machine shorthand by me and thereafter
transcribed under my supervision with computer-aided
transcription; that the deposition is a true record of
the testimony given by the witness; and that I am neither
of counsel nor kin to any party in said action, nor
interested in the outcome thereof.
    WITNESS my hand and official seal this      day of
November A.D., 2007.


                    _____
                    DEBRA A. DONNELLY, RPR
                    CERTIFICATE #151-PS
                    EXPIRATION: PERMANENT