# Exhibit A

Harry T. Collins

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HARRY T. COLLINS,                    )
                                     )
                Plaintiff,           )
                                     )
v.                                   )   Civil Action
                                     )   No. 05-624-SLR
WARDEN RAPHAEL WILLIAMS and          )
CORRECTIONAL MEDICAL SYSTEMS,        )
                                     )
                Defendants.          )

     Deposition of HARRY T. COLLINS, taken pursuant to
notice at the offices of the Delaware Department of
Justice, 820 N. French Street, 6th Floor, Wilmington,
Delaware, beginning at 10:01 a.m., on Monday,
November 19, 2007, before Debra A. Donnelly, Registered
Professional Reporter and Notary Public.

APPEARANCES:

     ERIKA Y. TROSS, ESQUIRE
     DELAWARE DEPARTMENT OF JUSTICE
          820 N. French Street, 6th Floor
          Wilmington, Delaware  19801
          for Warden Raphael Williams

     JAMES E. DRNEC, ESQUIRE
     BALICK & BALICK, LLC
          711 King Street
          Wilmington, Delaware  19801
          for Correctional Medical Systems


- - - - - - - - - - - - - - - - - - - - - - - - - - -
                CORBETT & WILCOX
          REGISTERED PROFESSIONAL REPORTERS
230 N. MARKET STREET  WILMINGTON, DELAWARE  19801
                (302) 571-0510
          Corbett & Wilcox is not affiliated
        with Wilcox & Fetzer, Court Reporters

Page 2

```
 1                 HARRY T. COLLINS,

 2        having been first sworn on oath, was

 3        examined and testified as follows:

 4                      --

 5                 MS. TROSS:  This is a deposition of

 6   Harry T. Collins, SBI No. 00156625, in the case Harry

 7   Collins vs. Linda Hunter, Warden Raphael Williams and

 8   Correctional Medical Systems, Civil Action No. 06-624.

 9                 EXAMINATION

10   BY MS. TROSS:

11        Q.   Mr. Collins, as I stated to you earlier, my

12   name is Erika Tross.  I represent Warden Raphael --

13        A.   Civil Action No. 05-624-SLR.

14        Q.   I'm sorry, that's correct.  Thank you for

15   correcting me.

16                 Mr. Collins, as I stated to you earlier,

17   my name is Erika Tross.  I represent State Defendant

18   Warden Raphael Williams in the matter.

19                 And I'm going to let Mr. Drnec introduce

20   himself for the record.

21                 MR. DRNEC:  James Drnec for Correctional

22   Medical Services, Inc.

23   BY MS. TROSS:

24        Q.   I'm going to explain to you a little bit about
```

Harry T. Collins

Page 3

1   the deposition process.

2       A.   All right.

3       Q.   It's part of discovery.  It's a series of

4   questions where your answers are being given under oath

5   and are subject to the laws relating to perjury.

6               You can object to any question I ask,

7   but you still must answer the question.

8               The court reporter will be taking down

9   all of my questions and all of your answers, so we can't

10  speak at the same time, because she can only take down

11  what is being said.  So we need to speak one at a time.

12  And all your responses must be verbal.  You can't nod

13  your head or say uh-huh, you have to say yes or no if the

14  question requires a yes or no answer.

15              I will assume that if you answer a

16  question, you've understood the question.  So if you

17  don't understand the question, please let me know, and

18  I'll either try to rephrase it or explain what I'm asking

19  for.

20              You are allowed to take breaks.  If you

21  need to take a break to use the restroom --

22      A.   How long does this take?

23      Q.   It's going to take, I would say, a few hours.

24      A.   A few hours?

Page 4

1      Q.   Yes.  So if you need to take a break just

2   because you want to stop for a moment or you would like

3   to use the restroom, please let me know, and we will

4   accommodate you.

5                I will give you time at the end to add

6   anything you think we didn't cover.

7                And I need to know if you are taking any

8   medication or drugs which cloud your judgment or prevent

9   you from giving honest answers to my questions?

10     A.   No.

11     Q.   Okay.  Let's talk a bit about your history.

12                Can you state your full name for the

13  record?

14     A.   Harry T. Collins.

15     Q.   Have you used any other names or aliases?

16     A.   Yes.

17     Q.   Could you tell me those other names, please?

18     A.   Right offhand, I'm not exactly sure.

19     Q.   Have you ever gone by the name Clarence

20  Shupe --

21     A.   Yes, I have.

22     Q.   -- S-H-U-P-E?

23                Just to remind you, we need to speak one

24  at a time for the sake of the court reporter.

Harry T. Collins

Page 5

1                    What about the name Tom Cruz, C-R-U-Z?

2       A.    Yes.

3       Q.    Thomas Cruse, C-R-U-S-E?

4       A.    I'm not sure.

5       Q.    You are not sure?

6                    Thomas Cosner, C-O-S-N-E-R, have you

7    ever gone by that name?

8       A.    Yes.

9       Q.    Thomas Swan, S-W-A-N, have you ever --

10      A.    I'm not sure.

11      Q.    You're not sure about that name?

12                   Have you ever gone by any nickname or

13   street name?

14      A.    Tom.

15      Q.    The T in your name, what does that stand for?

16      A.    Thomas.

17      Q.    I see you brought some items with you to this

18   deposition.

19                   Are those documents that have been

20   produced in this case?

21      A.    Yes.

22      Q.    Is there anything that you have with you that

23   you haven't produced to the defendants in this case?

24      A.    No.  Yes.

Page 6

```
 1      Q.    What would that be?

 2      A.    Medical files, before and after.

 3      Q.    Did you receive a copy of the State

 4  defendants' interrogatories and request for production of

 5  documents in this case?

 6      A.    Not sure.

 7      Q.    Okay.  We will talk a little bit about those

 8  later.

 9              Have you ever been deposed before?

10      A.    What's that mean?

11      Q.    What we're doing now.

12      A.    No.

13      Q.    Have you ever gone through this before?

14      A.    No.

15      Q.    Have you ever testified in court before?

16      A.    No.

17      Q.    Have you ever filed a civil lawsuit besides

18  this one?

19      A.    No.

20      Q.    What is your date of birth?

21      A.    10/3/58.

22      Q.    Where were you born?

23      A.    Wilmington, Delaware.

24      Q.    Did you also grow up in Wilmington?
```

Harry T. Collins

Page 7

1       A.    Yes.

2       Q.    Prior to your incarceration, your most recent

3   one that began on June 14th, where did you live just

4   prior to that?

5       A.    211 Harding Avenue, H-A-R-D-I-N-G.

6   Wilmington, Delaware, 19804.

7       Q.    How long were you a resident at Harding

8   Avenue?

9       A.    Fifteen years, off and on.

10      Q.    Who did you live with prior to --

11      A.    Mother.

12      Q.    I just need to finish the question before you

13   answer.

14             Who did you live with prior to that

15   current incarceration?

16      A.    Mother.

17      Q.    What is your highest level of education?

18      A.    Eighth grade.  Do you want to know what my IQ

19   is?

20      Q.    No, thank you.

21      A.    148.  I tested out between 146 and 148.

22      Q.    Okay.

23      A.    That's two points away from genius, if you

24   really want to know.

Page 8

```
 1      Q.   Where did you attend the 8th grade?

 2      A.   Wilmington High.

 3      Q.   What was the last full-time job you held prior

 4  to your incarceration?

 5      A.   I owned a Mr. Softee truck.

 6      Q.   Say that again?

 7      A.   I owned a Mr. Softee truck.   Ice cream

 8  business.

 9      Q.   How long were you in the ice cream business?

10      A.   About eight years.   I made anywhere between 6

11  to a thousand dollars a day.

12      Q.   Are you currently married?

13      A.   No.

14      Q.   Do you have any children?

15      A.   Three.

16      Q.   Mr. Collins, who is Raphael Williams?

17      A.   That's the warden of the prison.

18      Q.   Of which prison?

19      A.   Gander Hill.

20      Q.   If I use the name Howard Young, will you

21  understand that --

22      A.   Yes, I will.

23      Q.   -- to mean the same as Gander Hill?

24      A.   Yes, I will.
```

Harry T. Collins

Page 9

1        Q.    Can you give me a physical description of

2    Warden Williams?

3        A.    I have never seen this man before in my life.

4        Q.    Have you ever had a conversation with him?

5        A.    I have never had a conversation with this man

6    in my life.

7        Q.    Mr. Collins, do you understand the difference

8    between what someone personally does and what their

9    employees do?

10        A.    I understand the difference that Mr. Williams

11    is responsible for everything that happens in that

12    prison.  And I understand the difference that when

13    everything hits the fan, he is the one supposed to answer

14    any and all questions and debate it and come up with a

15    reasonable decision on what happens in his prison.  He's

16    responsible for that.  That's what I understand.

17        Q.    And your understanding, what is that based on?

18    Have you read that somewhere?

19        A.    That's based on his authority.

20        Q.    What do you base --

21        A.    Just like the president of the United States.

22        Q.    What do you base Warden Williams' authority

23    on?

24        A.    Like the president of the United States.

Page 10

1        Q.    But have you read somewhere what you just

2    described?

3        A.    Would I have to?

4        Q.    I'm asking you:   Have you read somewhere what

5    you just described?

6        A.    Assumption.   That's usually the way it works,

7    isn't it, chain of command?

8        Q.    So you are assuming that --

9        A.    No, I am not assuming anything.   I'm -- I'm

10   going by the education that I grew up with.

11       Q.    But you haven't --

12       A.    And what I've learned in the law libraries.

13   And Mr. Williams is responsible for whatever happens in

14   his prison.

15       Q.    So going back to my original question, do you

16   understand the difference between what someone personally

17   does and what their employees do?

18       A.    Yes, I do.

19       Q.    What is the difference?

20       A.    The difference is -- I don't understand the

21   question.

22       Q.    For example, do you understand what the warden

23   does, as opposed to what his correctional officers do, do

24   you understand that there is a difference there?

Harry T. Collins

Page 11

1    A.    Well, I understand that when he finds out what

2    they do, he's supposed to make a reasonable assumption

3    and do something about it, act on his authority.  That I

4    understand.

5    Q.    Do you understand that --

6    A.    Which he hasn't done in any of these matters,

7    not to my knowledge.  It was never approached to me on

8    any assumption or belief or anything, for that matter,

9    not even -- nobody has even come to me in writing or said

10   anything to me or anything.

11                I understand one of his officers grabbed

12   me by the throat until I passed out.  And I understand

13   that, that he -- he damn near strangled me to death, and

14   in order to make up for it, he sent me down the hole for

15   30 days.  I understand that.  Just so he could cover his

16   own back.

17                And I understand another thing, too.  I

18   would like to press charges on this man.  The two years

19   is not up yet for an assault, and I would definitely like

20   to press charges on this man.  I have been meaning to

21   call you about that for a long time now.

22                I understand that I give them in writing

23   the fact of what he done to me, and there was supposed to

24   be an investigation, their so-called investigation.  And

Page 12

1    I understand that nothing was ever found.

2                        I understand that the officers that were

3    in that mod when this happened were supposed to act upon

4    theirselves and do something about it, stand up to be

5    accounted for.  But considering the fact that they all

6    stick together is a reasonable assumption that nothing

7    would happen about it in the first place.

8        Q.    Are you finished?

9        A.    Yes.

10       Q.    Do you understand that correctional officers

11   must have the ability to take action and make decisions

12   without consulting the warden?

13       A.    Not in that extent, no.

14       Q.    So it's your belief that correctional officers

15   must always ask the warden permission before doing

16   something?

17       A.    No, it's my belief that a correctional officer

18   is always supposed to act in a reasonable manner before

19   taking any type of action given to him, appointed to him.

20   Like, they have certain procedures they have to go

21   through.  That's my belief.

22       Q.    Do you know what decisions the warden is

23   involved in and what decisions he's not involved in?

24       A.    It's my reasonable assumption that he is

Harry T. Collins

Page 13

1    involved in all the decisions.

2           Q.   And you said that's your assumption?

3           A.   Yes.

4           Q.   What is your assumption based on?

5           A.   Chain of command.

6           Q.   Is it based on anything that you have read?

7           A.   Some things I have read in the law library,

8    yes.

9           Q.   Such as what?

10          A.   I can't exactly comment on that right at this

11   point in time.

12          Q.   Why can't you comment?

13          A.   Because I have read a lot of things in the law

14   library.  I don't know just exactly everything I've read.

15          Q.   Are you referring to cases that you've read?

16   Are you referring to Department of Correction policies

17   that you've read?

18          A.   I think it was something to do with Department

19   of Correction policies.

20          Q.   Do you remember what those policies are?

21          A.   Not exactly.  I couldn't even point them out

22   to you at this time.

23          Q.   Well, if you do remember them, either at any

24   time during this deposition or afterwards, if you could

Page 14

1    please let me know what policies you are referring to.

2    Thank you.

3        A.   You make this whole thing out to look like the

4    warden is not responsible for anything in what he does.

5        Q.   I don't believe I've ever said that to you

6    just now.

7        A.   It's the questions that you are asking me.

8        Q.   Well, I'm trying to --

9        A.   That's a reasonable assumption to me right

10   there, that you are saying that -- you know, this is like

11   a joke.  You know what?  This is a joke.

12       Q.   Mr. Collins, I'm trying to understand why you

13   sued Warden Williams, why you made him a defendant in

14   this lawsuit?

15       A.   Well, I will tell you what.  Let's get him in

16   court and find out then.

17       Q.   Mr. Collins, let me tell you that if you

18   choose --

19       A.   I'm not sitting here for two hours for this in

20   the first place.

21       Q.   If you choose not to continue with this, the

22   defendants will move to dismiss this case for your

23   failure to prosecute it.

24       A.   Let them move to dismiss it, then.  Because

Harry T. Collins

Page 15

1    you know what --

2        Q.    So you are choosing to end this deposition?

3        A.    Yep.  Because these questions you are asking

4    me I think are very threatening.

5        Q.    How have I threatened you?

6        A.    Because you are just -- I kind of figured this

7    out anyway.

8        Q.    Well, Mr. Collins, I just want you to

9    understand that the defendants will move to dismiss this

10   case.

11       A.    That's all right.  Then I will appeal to a

12   higher court, Supreme Court, you know.  I have no problem

13   with that.  And I will get my day in court.  Eventually I

14   will get my day in court.

15              MS. TROSS:  Okay.  The deposition of

16   Harry Collins is now over, as Mr. Collins has chosen to

17   leave the deposition before it's ended.

18              Do you have anything you would like to

19   say for the record?

20              MR. DRNEC:  No, I think the record

21   speaks for itself.

22              (Deposition concluded at 10:15 a.m.)

23

24

Page 16

1                    I N D E X

2

    DEPONENT:  HARRY T. COLLINS                    PAGE
3
       Examination by Ms. Tross                      2
4

5              E X H I B I T S

6   (There were no exhibits marked for identification.)

7

8

9

10

11   CERTIFICATE OF REPORTER                    PAGE 17

12

13

14

15

16

17

18

19

20

21

22

23

24

Harry T. Collins

Page 17

```
 1              C E R T I F I C A T E
    STATE OF DELAWARE
 2
    NEW CASTLE COUNTY
 3

 4      I, Debra A. Donnelly, a Notary Public within and for

 5   the County and State aforesaid, do hereby certify that

 6   the foregoing deposition of HARRY T. COLLINS was taken

 7   before me, pursuant to notice, at the time and place

 8   indicated; that said deponent was by me duly sworn to

 9   tell the truth, the whole truth, and nothing but the

10   truth; that the testimony of said deponent was correctly

11   recorded in machine shorthand by me and thereafter

12   transcribed under my supervision with computer-aided

13   transcription; that the deposition is a true record of

14   the testimony given by the witness; and that I am neither

15   of counsel nor kin to any party in said action, nor

16   interested in the outcome thereof.

17      WITNESS my hand and official seal this      day of

18   November A.D., 2007.

19

20   _____

21   DEBRA A. DONNELLY, RPR
     CERTIFICATE #151-PS
22   EXPIRATION:  PERMANENT

23

24
```

# Exhibit B

Superior Court of Delaware.
Dwight L. DAVIS, pro se Plaintiff,
v.
WEST CENTER CITY NEIGHBORHOOD PLANNING ADVISORY COMMITTEE, INC., Kester
I.H. Crosse, Esquire, John H. Williams, Esquire, Brenda Phillips, and Melvin Phillips,
Defendants.
No. Civ.A. 02C-03-249JEB.
Submitted Feb. 21, 2003.
Decided March 7, 2003.

Upon the Parties' Cross Motions for Summary Judgment. Defendants' Motions Granted.
Plaintiff's Motion Denied.
Dwight L. Davis, Wilmington, Delaware, pro se Plaintiff.

Colin M. Shalk, Wilmington, Delaware, for Defendants WCCNPAC, Brenda Phillips and
Melvin Phillips.

John A. Elzufon, and Joseph F. Gula, III, Wilmington, Delaware, for Defendant John H.
Williams.

Daniel A. Griffith, Wilmington, Delaware, for Defendant Kester I.H. Crosse.


OPINION


BABIARZ, J.
*1 This is the Court's decision on a series of motions stemming from Plaintiff Dwight
Davis' suit for slander and civil conspiracy, which he filed against the West Center City
Neighborhood Planning Advisory Committee ("WCCNPAC") and various individuals
associated with it. Cross motions for summary judgment have been filed, along with one
non-dispositive motion. For the reasons explained below, Defendants' motions for
summary judgment are granted, and Plaintiff's motion for summary judgment is denied.


FACTS

WCCNPAC is a not-for-profit Delaware corporation, established in part to help allocate
and distribute federal funds to several neighborhoods in the City of Wilmington. Each
neighborhood in the corporation appoints one or more members to the Board of
Directors, and in 1998 Plaintiff was appointed to the Board by the West Center City
Neighborhood Association. At some time thereafter, Plaintiff recommended an individual
named Terry James for employment with WCCNPAC, and she was hired as a staff
member.

In July 2000, Ms. James met with Kester Crosse, Esquire, to discuss a handwritten note
she had found on her desk at work. The note, which was signed "Dwight," addressed Ms.
James' alleged drug usage. The writer insisted that James seek help for her addiction
and offered to attend Alcoholic Anonymous meetings with her. He stated that he would
report her to WCCNPAC if she rejected his offer. Ms. James believed that "Dwight" was
Plaintiff Dwight Davis, who had also come to her home uninvited and banged on her
windows to get her attention. Plaintiff does not dispute that he wrote the note in
question.

After meeting with Ms. James, Mr. Crosse wrote a letter to Brenda Phillips, WCCNPAC's executive director, informing her of Plaintiff's conduct and requesting that the WCCNPAC Board of Directors handle the matter internally. He also enclosed a copy of Plaintiff's note to Ms. James. In July 2000, the Board voted to suspend Plaintiff until the matter was investigated and resolved. [FN1]

FN1. *See* Plaintiff's Opposition to Motion to Dismiss, Ex. E, Minutes of WCCNPAC Executive Session of Board of Directors, July 31, 2000, at 2.
In March 2002, Plaintiff filed suit in Superior Court, alleging that Defendants committed slander *per se* and conspired to illegally remove him from the Board. Plaintiff seeks $10 million in compensatory and punitive damages for injury to his reputation. Cross motions for summary judgment have been filed. Briefing is complete and the issues are ripe for decision.


## STANDARD OF REVIEW

Summary judgment may be granted where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. [FN2] On cross motions for summary judgment, the Court must consider whether either side has presented a genuine issue of material fact. [FN3] The evidence must be viewed in the light most favorable to the non-moving party. [FN4] Where a motion for summary judgment is properly supported, the burden shifts to the non-moving party to demonstrate that there are material issues of fact. [FN5] Where there are some disputed facts, summary judgment is still warranted if the undisputed facts and the non-movant's version of the disputed facts entitled the non-movant to judgment as a matter of law. [FN6]

FN2. *Dale v. Town of Elsmere,* 702 A.2d 1219, 1221 (Del.1997).
FN3. *Emmons v. Hartford Underwriters Ins. Co.,* 697 A.2d 742, 745 (Del.1997).
FN4. *Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 99-100 (Del.1992).
FN5. *Brzoska v. Olson,* 668 A.2d 1355, 1364 (Del.1995).
FN6. *State Farm Mut. Auto. Ins. Co. v. Mundorf,* 659 A.2d 215, 217 (Del.1995).


## DISCUSSION

**\*2** Plaintiff makes different allegations against different defendants. He alleges that both Melvin Phillips, a Board member, and Brenda Phillips, executive director, made slanderous statements about him to City employees. He also alleges that the Defendants illegally publicized both his note to Terry James and the Crosse letter in a conspiratorial effort to remove him from the Board. He alleges that the Crosse letter itself is libelous. Defendants argue for summary judgment because Plaintiff has not put forth any evidence to support his allegations, and has thwarted the discovery process. In his cross motion for summary judgment, Plaintiff raises new issues regarding Ms. James' personal history; the WCCNPAC corporate charter; a letter from John Williams, Esquire, to Samuel Guy, Esquire; and the validity of Plaintiff's suspension from the Board. To the extent that these issues are intended as responses to Defendants' motions, they are not relevant to the conduct alleged in the Complaint. To the extent that they are new issues, they are not properly raised for the first time in a summary motion and are therefore not addressed in this Opinion.

To have a cognizable claim for defamation, which includes both slander and libel, a plaintiff must show that the defendant made a false and defamatory statement about him in an unprivileged communication to a third person. [FN7] Generally, slander requires a showing of special damages because the written word, that is, libel, is potentially more dangerous to reputation than the spoken word. [FN8] However, four categories of slander are actionable without special damages, including statements which (1) malign one in a

trade or profession; (2) impute a crime; (3) imply that one has a loathsome disease; and (4) impute unchastity to a woman.[FN9] Plaintiff alleges that Defendant Melvin Phillips accused him of the crime of Stalking in a statement to a third person identified only as a City employee. At his deposition Plaintiff refused to answer any questions about the third person. He failed to appear for his noticed re-deposition and has never identified the third person. Other than his own bare and incomplete assertions, Plaintiff presents no evidence to support a claim of slander against Melvin Phillips, and Phillips' motion for summary judgment is therefore granted.

FN7. *Bray v. L.D. Caulk Dentsply Internat'l,* Del.Supr., No. 541, 1999, Berger, J. (March 8, 2000).
FN8. *Spence v. Funk,* 396 A.2d 967, 969 (Del.1978).
FN9. *Id.* at 970.
Plaintiff's claim against Brenda Phillips, WCCNPAC's executive director, also fails. Plaintiff alleges that Ms. Phillips told Bessie Ashe, a Board member, that Plaintiff had committed an unspecified criminal act against a former employee of WCCNPAC. Defendant Phillips argues that Plaintiff has not brought forth any evidence of slander. The record shows that Ms. Ashe was subpoenaed to appear at defense counsel's office for her deposition. On the scheduled day, Plaintiff left a message on counsel's voice mail, stating that Ms. Ashe was unable to appear. When counsel spoke with Ms. Ashe to reschedule the deposition, she refused to cooperate and has never been deposed. Without her testimony, there is no evidence of slander other than Plaintiff's unsupported assertions. Brenda Phillips' motion for summary judgment is granted, and her motion to cite Ms. Ashe for contempt is denied.

*\*3* Defendant John Williams, counsel for WCCPAC, moves to strike the pleadings against him as a matter of law because Plaintiff failed to participate in discovery. The record supports Williams' contention. During his deposition, Plaintiff would not answer any questions from Williams' attorney on the grounds that Williams had outstanding discovery matters. Although this is no reason to delay a deposition, counsel for Williams relented and subsequently attempted to schedule a second deposition. Counsel wrote three letters to Plaintiff but received no response. At the appointed hour, counsel for WCCNPAC, Crosse and Williams appeared, as well as the court reporter. The only person absent was Plaintiff. Prior to filing the motion to dismiss, Williams' counsel left two phone messages requesting Plaintiff to contact him. Again nothing.

Defendant Williams argues that if a party fails to appear at a deposition after receiving proper notice, and has failed to apply for a protective order under Rule 26(c), the Court may take just action, including either striking the pleadings or dismissing the action, pursuant to Super.Ct.Civ.R. 37(d). In this case, Plaintiff has not cooperated in discovery and has not offered a reasonable explanation for his conduct. Without meaningful discovery, Defendant Williams cannot prepare a defense and has no recourse other than Rule 37(d). [FN10] The Court finds that Plaintiff has deliberately and repeatedly refused to take part in discovery pertaining to Defendant Williams, and that the only just result is to strike the pleadings that pertain to this Defendant.

FN10. *Novak v. Tigani,* 112 A.2d 853, 854 (Del.1955)(observing that Rule 37(d) provides the only available sanction for a person's refusal to attend his own deposition upon notice).
Defendants WCCNPAC, Brenda Phillips and Melvin Phillips also move for summary judgment on Plaintiff's allegation that publication of the James letter and the Crosse letter at the Board meeting constituted slander *per se.* Defendants argue that the distribution was a privileged communication and that the copies of the letters were collected at end of the meeting to prevent further dissemination. A qualified privilege extends to communications made between people who have a "common interest for the protection of which the allegedly defamatory statements are made" or which are

"disclosed to any person who has a legitimate expectation in the subject matter." [FN11] The James letter was written by a Board member to an employee and was of dubious content. The Crosse letter requested that the matter be handled internally, and the only way to do so was to present both letters to the Board for its consideration. The Board had a legitimate interest in the subject matter of the letters, which pertained to the conduct of a Board member toward a WCCNPAC employee. The Court finds as a matter of law that a qualified privilege extends to publication of the letters to Board. The motion for summary judgment is granted on this issue.

FN11. *Henry v. Delaware Law School of Widener University, Inc.,* 1998 WL 15897 at *11 (Del.Ch.1998) (citations omitted).
This conclusion renders moot Plaintiff's allegation that Defendants engaged in a civil conspiracy to divest him of a seat on the Board. In Delaware, civil conspiracy does not exist as an independent cause of action, but it can be alleged where there is an underlying harm in which more than one person participated.[FN12] Because the Court has found as a matter of law that Plaintiff has failed to state a viable defamation claim, there can be no derivative claim for civil conspiracy.

FN12. *Id.* (citations omitted).
*4 Plaintiff alleges that the Crosse letter was libelous. Defendant Crosse moves to dismiss for lack of prosecution or in the alternative for summary judgment for failure to state a claim upon which relief can be based. Libel is a written publication which defames the plaintiff in an unprivileged communication.[FN13] It is actionable without special damages, whether the defamatory nature is apparent on the face of the statement or only by reference to extrinsic facts.[FN14]

FN13. *Bray v. L.D. Caulk Dentsply Internat'l,* at *1.
FN14. *Spence v. Funk,* 396 A.2d at 970.
In this case, Ms. James testified at her deposition that all the facts Mr. Crosse stated in his letter were true, and Plaintiff does not contest the facts. Rather, he alleges that Defendant Crosse wrote the letter in order to force Plaintiff off the WCCNPAC Board. Truth is an absolute defense to a defamation action,[FN15] and the Court finds that the facts alleged in the Crosse letter are true and are therefore not libelous. The letter also expresses Defendant Crosse's professional opinion that Plaintiff's actions included elements of sexual harassment, stalking, extortion and inappropriate behavior. However, Defendant Crosse sent the letter only to Brenda Phillips and asked that the Board handle the matter internally. Thus, there was no unprivileged communication, nor is there any evidence that Defendant Crosse wrote the letter with malice. Defendant Crosse's motion for summary judgment is granted.

FN15. *DeBonaventura v. Nationwide Mut. Ins. Co.,* 428 A.2d 1151, 1155 (Del.1981)
Finally, the Court reiterates that Plaintiff has refused to participate in any meaningful way in the discovery process. At his deposition, Plaintiff refused to answer any questions about his relationship with Terry James, which is the heart of the matter. He would not answer questions about the unidentified WCCNPAC employee or his allegations about Defendant Williams. Plaintiff failed to appear for her deposition and did not respond to Defendant Crosse's written interrogatories. These facts are uncontested, and nothing in Plaintiff's motion for summary judgment justifies them. Furthermore, Plaintiff does not deny having written the note to Ms. James. The Court concludes that there are no genuine issues of material fact and that Defendants are entitled to judgment as a matter of law.


CONCLUSION

For all these reasons, Defendants' motions for summary judgment are granted and Plaintiff's motion for summary judgment is denied.

*It Is So Ordered.*